**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION
Civil Action No. 4:14-cv-00131-WTM-GRS**

| | | |
|---|---|---|
| DANIEL DEFENSE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **CIVIL ACTION NO.** |
| v. | ) | **4:14-cv-00131-WTM-GRS** |
| | ) | |
| REMINGTON OUTDOOR COMPANY, | ) | |
| INC., AKA FREEDOM GROUP, INC. and | ) | |
| REMINGTON ARMS COMPANY, LLC | ) | |
| DBA DPMS FIREARMS/PANTHER | ) | |
| ARMS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DANIEL DEFENSE'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION.

COMES NOW Plaintiff Daniel Defense, Inc. (hereinafter "Daniel Defense" or Plaintiff), and respectfully submits this Reply Brief in Support of its Motion for Preliminary Injunction against Defendants Remington Outdoor Company, Inc. (AKA Freedom Group, Inc.) and Remington Arms Company, LLC (dba DPMS Firearms/Panther Arms) (collectively, the "Defendants" or "Remington").

By submitting a more than 110 page response,[1] Remington hopes, by use of irrelevancy and mis-citation, to dilute, diminish and distort the salient facts and law before the Court.

Thus, Daniel Defense corrects, *infra,* Remington's multiplicity of errors of fact and law regarding each of the required factors:

---

[1] *See,* Opposition to Motion, Doc. 41, filed 12/4/2014, (Defendant's Opposition to Motion for Preliminary Injunction: 41 pages) (Exhibit A: 14 pages) (Exhibit B: 5 pages) (Exhibit C: 22 pages) (Exhibit D: 11 pages) (Exhibit E: 2 pages) (Declaration of Adam Ballard: 15 pages) totaling 110 pages.

A district court may grant injunctive relief if the movant shows the following: (1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

*McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir.1998).

## I.   The Public Interest is Preserved by the Limited and Reasonable Relief Sought by Daniel Defense.

Unfortunately, Remington has argued the error in logic that, in protecting its trademarks, Daniel Defense supposedly seeks to remove ordinary words ("common English adjectives"), from the English language. (*See,* Response to Motion, Doc. 41, filed 12/4/2014, pp. 2, 19, 20). Remington is incorrect.  In fact, many well-known trademarks consist of ordinary words[2] from the English language and as such, need not be newly-coined terms[3] in order to fulfill their function as an indicator of a source of origin to the Public.

Daniel Defense has never sought to withdraw the words comprising its trademarks from the English language, but rather Daniel Defense seeks only the following modest relief in order to protect its Federally Registered trademarks, and to prevent confusion among the Public:

Remington shall discontinue or otherwise modify the complained of use, marketing and advertising such that:

a.    The words "Lighter Stronger" (in that order), and two of the three words "Lighter" "Stronger" "Better" (in any order) with confusingly similar variation thereof -- do not appear in any font, that is larger or otherwise substantially emphasized, from other text -- in Remington's use, marketing and advertising. For purposes of clarity, Remington shall be allowed to use any one of these words in isolation, in a font that is larger or otherwise emphasized, from other text in its use, marketing and advertising (*e.g*., "Lighter", or "Better", or "Stronger" etc.).

b.    The advertisements do not contain two repeating Chevrons in isolation regardless of direction (*e.g.,* up, or down, or left, or right, or angled).

---

[2] For example, Apple®, General Electric®, International Business Machines®, Bank of America®.
[3] For example, Motorola®, Coca-Cola®, Kodak®, Polaroid®, Microsoft®, etc.

Inasmuch as the entire purpose of trademark law is to prevent confusion among the purchasing public, this <u>reasonable and necessary relief</u> (to protect the (i) "Lighter. Stronger. Better…" ® and (ii) Chevrons trademarks ®) is in the Public interest, and hence should be granted.

## II.    <u>The Equities Between the Parties Tilt in Favor of Daniel Defense.</u>

### A.    <u>Daniel Defense Has Trademark Priority.</u>

Unfortunately, Remington has raised another distraction, in its contention that Daniel Defense has somehow not shown trademark priority. (Doc. 41, filed 12/4/2014, pp. 7-8).  In fact, Daniel Defense did submit to the Court its Declaration on the subject of trademark priority (*See,* Declaration of Marvin C. Daniel, Doc 28-4, ¶¶ 7-8, filed 11/10/2014), <u>which Remington did not contest</u>, and which states:

> 7.    Daniel Defense has continuously used the trademark "Lighter. Stronger. Better ..." ® to identify and to distinguish Daniel Defense accessory parts for firearms, namely, mounting rail apparatus and mounting rails, firearm sling mounts, firearm optic mounts, firearm light mounts, and upper receivers for feeding and ejecting cartridges to firearms, since <u>at least as early as February 9, 2006.</u>

> 8.    Daniel Defense has continuously used the trademark ">>" to identify and to distinguish Daniel Defense firearms and firearms accessories, namely, complete rifles, upper and lower receivers, barrel assemblies, rifle rail systems, firearm vertical grips, firearm sights, firearm sling mounts, firearm ammunition, firearm flash brakes, firearm mounts for attaching accessories to firearms and firearm flash hiders, since <u>at least as early as December 11, 2011,</u> <u>"anywhere" and at least as early as January 13, 2012 "in interstate commerce".</u> <u>(emphasis added).</u>

*Id.*

In contrast, and although perhaps hinting for priority against Daniel Defense's Federal Registrations, <u>Remington has not represented to the Court that it has used the infringing marks</u>

prior to Daniel Defense (i.e., (a) February 9, 2006, and (b) December 11, 2011/January 13, 2012, respectively).

**B.    The Facts of Remington's Trademark Misappropriation.**

Remington does not deny that:

1.    Daniel Defense has two (2) federal trademark registrations,[4] and thus is entitled to the full range of statutory presumptions for each;

2.    Remington has literally copied: (a) Daniel Defense's double Chevron design (in its entirety); and (b) the first two elements of Daniel Defense's "LIGHTER. STRONGER. BETTER…" ® trademark;[5]

3.    Both Daniel Defense and Remington use the registered trademarks in the Internet marketplace on firearms and/or firearms components and accessories;

4.    Remington has no need to use Daniel Defense's trademarks, as thousands of other marks are available for Remington's adoption and use;

5.    Remington is fully permitted to use the English words "lighter", "better" and/or "stronger" in a <u>non-trademark manner</u> *(i.e.,* in a non-attention getting manner and/or as a part of an English sentence).

**C.    Remington's Taking is a Classic Trademark Use, Not a "Descriptive Fair Use".**

**1.    Remington's Skewed Argument.**

Remington has contended that it does not commit trademark infringement, based upon an attempted application of the doctrine of "descriptive fair use", and more particularly that it allegedly does not use Daniel Defense's trademarks "in a trademark sense". (Doc. 41, filed

---

[4] Registration on the Principal Register provides additional benefits, including: (i) a statutory presumption that (a) the mark is valid, (b) the registrant is the owner of the mark, and (c) the registrant has the exclusive right to use the registered mark;(ii) the registration is proof that the mark has acquired secondary meaning; (iii) the registration serves as constructive notice of a claim of ownership, eliminating any justification or defense of good faith adoption and use made by a third party after the registration date; (iv) the registrant is entitled to nationwide priority based on the filing date; and (v) the registration becomes incontestable after five years on the Principal Register, creating conclusive evidence of the registrant's exclusive right to use the mark, subject to certain statutory defenses. 15 U.S.C. § 1051 *et seq.*

[5] And, Remington has incorrectly argued that the third element of its copying allegedly does not translate into the equivalency and meaning of the third trademark element, "Better". It does.

12/4/2014, pp. 10-11).  Based upon the prevailing legal authorities and the clear facts,
Remington contentions must be rejected.

Specifically, Remington creates a likelihood of confusion with Daniel Defense's
registered trademarks, and thus is infringing Daniel Defense's trademark rights by reason of their
use of: (a) the Chevron trademark; and (b) the "LIGHTER, STRONGER, and even more
badass." and/or 'LIGHTER, STRONGER and even more accurate…'" trademarks in association
with the advertising of firearms and associated firearms accessories.

**2.     The Facts of Remington's Trademark Uses.**

One example of Remington's published offending use of Daniel Defense's registered
trademarks is:



Accordingly, Remington has <u>set-apart</u>, <u>capitalized</u>, and thus <u>emphasized</u>:

1.      the word mark "LIGHTER, STRONGER AND EVEN MORE BADASS";
2.      Daniel Defense's Chevron(s) trademark; and
3.      has not predominantly shown the source indicator "DPMS" anywhere.

Secondly, and most significantly, the manner of use by Remington is <u>functionally</u> <u>identical</u> to the use and specimen of Daniel Defense (such that the United States Patent and Trademark Office ("USPTO") found it to constitute a trademark use). *See,* Daniel Defense's USPTO submitted Trademark Specimen, Exhibit A hereof.  Moreover, Remington's use is nearly identical to Daniel Defense's contemporaneous use of its "LIGHTER. BETTER. STRONGER…" ® trademark on its website[6] is:



*See*, https://danieldefense.com/daniel-defense-m4-carbine-v3-1049.html.

Hence, all of the following respective uses are (for any relevant purpose) <u>identical</u>:

1. Remington's infringing use;
2. Daniel Defense's specimen and use before the USPTO;
3. Daniel Defense's current use on its website; and
4. Uses by the industry journalists, bloggers, etc.

---

[6] The Daniel Defense®/Lighter. Stronger. Better… ® logo is the main Daniel Defense company identifier that is widely used by industry journalists, commentators, advertisers, bloggers and consumers.

### 3.     The Relevant Law on "Descriptive Fair Use".

Unaccountably, and without any evidentiary or legal support, Remington nakedly argues

the affirmative defense of "descriptive fair use". However, these arguments are of convenience

and are made without any credible and/or competent support thereof.

The doctrine of "descriptive fair use" is statutorily set forth at 15 U.S.C § 1115(b)(4), and

which provides (in a proper case) the defense to allegations of infringement:

> (4)     That the use of the name, term, or device charged to be an infringement is
> a use, otherwise than as a mark … of a term or device which is descriptive
> of and used fairly and in good faith only to describe the goods or services
> of such party…

*Id.*

In order to prove a "descriptive fair use" defense, the defendant must prove **each** of the

following elements, and specifically that its "Use" is:

> (1) other than as a mark,
> (2) in a descriptive sense, and
> (3) in good faith.

*International Stamp Art Inc. v. US Postal Service,* 456 F. 3d 1270, 1274 (11th Cir. 2006), *citing
EMI Catalogue P'ship v. Hill, Holliday, Connors, & Cosmopulos, Inc.,* 228 F.3d 56, 64 (2d Cir.
2000) (*citing* 15 U.S.C § 1115(b)(4)); *see also Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178,
1185 (5th Cir.1980); *Kelly-Brown v. Winfrey,* 717 F. 3d 295, 305 (2nd Cir. 2013).

To place the doctrine of "descriptive fair use" into perspective, the leading case in the

11th Circuit on the subject of "likelihood of confusion" is *Lone Star Steakhouse v. Longhorn*

*Steaks*, 122 F. 3d 1379, 1382 (11th Cir. 1997), which states:

> In determining the likelihood of confusion between the two marks, we require a
> district court to analyze the following seven factors: (1) type of mark, (2)
> similarity of mark, (3) similarity of the products the marks represent, (4)
> similarity of the parties' retail outlets and customers, (5) similarity of advertising
> media used, (6) defendant's intent and (7) actual confusion.

*Id.*

The similarity of trademarks is to be determined based upon the "sight, sound and

meaning" of the respective terms. *Frehling Enterprises v. Int'l Select Group*, 192 F. 3d 1330,

7

1337 (11th Cir. 1999); *Nautilus Group, Inc. v. ICON Health and Fitness, Inc.*, 372 F.3d 1330, 1344 (Fed. Cir. 2004).

In determining "similarity of the marks", the marks may not be dissected and the parts then analyzed separately. *In re National Data Corp.*, 753 F.2d 1056, 1058 (Fed. Cir. 1985). The similarity of the marks is "determined by considering the overall impression created by the mark[s] as a whole rather than simply comparing individual features of the marks." *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 975 (11th Cir. 1983) *citing Exxon Corp. v. Tex. Motor Exch., Inc.*, 628 F.2d 500, 504-05 (5th Cir.1980). To determine the similarity of the marks, "the court compares the marks and considers the overall impressions that the marks create, including the sound, appearance, and manner in which they are used." *Frehling,* 192 F.3d at 1337 *citing Harland,* 711 F.2d at 975–76. [L]ikelihood of confusion cannot be predicated on dissection of a mark, that is, on only part of a mark." *In re Nat'l Data Corp.,* 753 F.2d at 1058.

### 4.    There is No "Descriptive Fair Use" Here.

### i.    First Factor: Use "Other Than as a Mark".

In the case of *Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F. 2d 947 (7th Cir. 1992), the Defendant Quaker had attempted to create a defense of "descriptive fair use", <u>but was unsuccessful.</u> There, the Plaintiff had a federal trademark registration on the term "Thirst Aid", and Quaker had published advertisements that included the statement "Gatorade is THIRST AID."

In rejecting the attempted fair use defense, the Court found that Quaker had used the Plaintiff's trademark as an **<u>"attention getting device"</u>**, *inter alia,* by use of prominent and large font type, and stated in regard to the standards for determining the existence of a "trademark use":

The evidence of Quaker's advertisements supports the district court's conclusion that Quaker used "Thirst Aid" as a trademark. Quaker's ads do not simply use the words "Thirst Aid" in a sentence describing Gatorade, but as an "attention-getting symbol." 1 *McCarthy*, supra § 11:17, at 476. In many of the ads, the words "Thirst Aid" appear more prominently and in larger type than does the word "Gatorade". Id. at 476 n. 7 (collecting cases). Further, given the rhyming quality of "Gatorade" and "Thirst Aid," the association between the two terms created by Quaker's ads is likely to be very strong, so that "Thirst Aid" appears as part of a memorable slogan that is uniquely associated with Quaker's product. *See Louis Rich, Inc. v. Horace W. Longacre, Inc.*, 423 F.Supp. 1327 (E.D.Pa.1976) (use meant to foster identification with defendant and its product is not a fair use). Quaker presented no evidence that its "Thirst Aid" ads do not have this effect on consumers. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The district court did not err in concluding that Quaker used "Thirst Aid" as a trademark.

*Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F. 2d 947, 954 (7th Cir. 1992).

Accordingly, the above advertising of Remington graphically shows that the bold print terms "LIGHTER, STRONGER, and even more badass." and "LIGHTER, STRONGER, and every bit as accurate…" are not used **in a sentence** – but rather are used as **"an attention getting device".**

And clearly, Remington's use of Daniel Defense's Chevron trademark is in no sense "descriptive", and thus no "descriptive fair use" defense can apply there either.[7]

The sub-tests for "trademark use" have also been described by other Courts, as follows:

To determine whether a term is being used as a mark, we look for indications that the term is being used to "associate it with a manufacturer." *Sierra On-Line, Inc. v. Phoenix Software, Inc.,* 739 F.2d 1415, 1423 (9th Cir.1984). Indications of trademark use include whether the term is used as a "symbol to attract public attention," *JA Apparel Corp. v. Abboud,* 568 F.3d 390, 400 (2d Cir.2009), which

---

[7] Moreover, Remington argues that: "Simple design elements such as the double bracket design are generally perceived by consumers as mere decorations on a label or advertisement, not as source-indicating trademarks." (Doc. 41, filed 12/4/2014, page 12). Remington's gross generality is, of course, wrong. For example, Mercedes-Benz uses a simple "three-point star" ⊘ , and Chrysler uses a simple "pentagram" ⬠ , whereas Ford is popularly designated by an ordinary oval . McDonald's uses two arches M ; Texaco uses a 5-pointed star ✪ , as does Converse ✪ ; and Guess ▽ and Bass Ale use a triangle ▲ .

can be demonstrated by "the lettering, type style, size and visual placement and prominence of the challenged words," *McCARTHY* § 11:46. Another indication of trademark use is whether the allegedly infringing user undertook "precautionary measures such as labeling or other devices designed to minimize the risk that the term will be understood in its trademark sense." *RESTATEMENT (THIRD) OF UNFAIR COMPETITION* § 28 cmt. c (1995) ("*RESTATEMENT*"); see also *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 639 (7th Cir.2001) (noting, in finding fair use, that the newspaper's "joy of six" t-shirt "plainly indicat[ed] the Tribune as the source").

*Fortune Dynamic v. Victoria's Secret Stores Brand*, 618 F. 3d 1025, 1040 (9th Cir. 2010).

Thus, yet another factor negating Remington's argument for descriptive fair use is its lack of any suitable "precautionary measures" for the term -- not to appear to the Public as constituting a trademark. *Id.* for *Fortune*, at 1040, 1042.  Also, a further factor cutting against Remington's descriptive fair use argument is the availability of "an abundance of alternative words" that Remington could have selected, rather than to trade-on and copy Daniel Defense's registered trademarks. *Id.* for *Fortune* at 1042-43.

  **ii. Second Factor: Use "in a Descriptive Sense".**

Remington also must prove the second required factor, *supra* (i.e., that its uses of the "Lighter, Better…" sub-elements are somehow descriptive), rather than acting as a source of origin indicator.  However, during examination of Daniel Defense's trademarks, the USPTO did <u>not require a showing of secondary meaning</u>, which demonstrates that these terms are not "merely descriptive". (S*ee*, Exhibit D-1 hereof, p.1).

Moreover, Remington also has misappropriated Daniel Defense's Chevron trademark, and has no rational argument for "descriptiveness" that can be fashioned for this infringement.

Also, yet further, Remington has used the "Lighter, Better…" sub-element at least <u>twice</u> in fashioning a "family of marks", and thus their intent to use such terms as a source of origin indicator is clear.  Manifestly, <u>repeated</u> use of the same infringing elements cuts against Remington's fair use defense. *See, Kelly-Brown v. Winfrey*, 717 F. 3d 295, 310 (2nd Cir. 2013).

### iii.    Third Factor: Use "in Good Faith".

On the subject of Remington's burden to prove the required third factor of "good faith", it would also appear to have considerable difficulty.  First, the Daniel Defense "word mark" has been used for eight (8) years, and prominently in Daniel Defense's advertising in the industry. Daniel Defense unquestionably is a direct competitor.  Therefore, there can be no question that Remington directly and intentionally copied the first two (out of three) sub-elements of Daniel Defense's trademark Lighter. Stronger. Better…®.  This alone is solid evidence of bad faith. Yet further, Remington has used the "Lighter. Stronger." sub-element twice in fashioning a "family of marks".

Additionally, knowledge of the mark of another <u>plus</u> the decision to go ahead and use the mark (and particularly where an added "house-mark" is <u>not</u> the predominant element in a commercial presentation), also supports a finding of bad faith.  In any event, proof of its affirmative defense of "descriptive fair use" is Remington's burden, a burden which it has not discharged.

Accordingly, it is concluded that Remington is not entitled to any "descriptive fair use" defense, because (and as a threshold issue) it would not be able to meet its burden of proving that it is not using the mark as a trademark.  Moreover, the facts clearly show that (even assuming *arguendo* that Remington could meet its burden on the first issue, which it cannot), the undisputed facts of record show that Remington cannot meet its burden of proving second and third factors, regarding descriptiveness and good faith.

11

**D.   Remington's Activities in Publishing Daniel Defense's Trademarks in Catalogues and on the Internet Constitute Trademark Infringement.**

Remington again is incorrect in contending that there supposedly must be "affixation" of the accused mark to the goods, in order for trademark infringement to exist. (Doc. 41, filed 12/4/2014, pp. 10, 29, 30).  Remington is wrong.

The prevailing law states:

Section 32(1)(a) of the Lanham Act grants the registrant of a trademark a cause of action against any person who, without the registrant's consent, "use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, **or advertising** of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive."

*See,* 15 U.S.C. § 1114 1(a) (emphasis added).

Here, Remington does not deny that it uses the accused terms in its **marketing** and **advertising** comprising (at least in) the following: (i) its electronic and hard print catalogue; and (ii) on its Internet website, as shown above.

**E.   Remington's Alleged "Double-Theme" Does Not Excuse Trademark Infringement.**

Without citation to any applicable legal authority, Remington suggests that it should somehow be excused from misappropriating Daniel Defense's registered Chevron trademark, and purportedly because Remington has adopted a "double-theme" of sorts.[8]

Of course, and even assuming *arguendo* that Remington did prefer yet another "double-logo" of some kind, many such other double shapes/logos would be available to it (and, without misappropriating Daniel Defense's registered Chevron trademark).

---

[8] Remington describes its so-called "double-theme", as:
- aesthetic complement to the modern, geometric style of the 2014 catalog and promotional materials;
- numerous references to and word plays based on the number "two" (such as "DESIGNED II DOMINATE"); and
- doubled design elements (such as the new GII logo). (Doc. 41, filed 12/4/2014, p. 4).

**F.      Remington's Multiple Errors of Law.**

     **1.      Remington Misconstrues the *Mango's* Case.**

      Unaccountably, in more than sixteen (16) places in its brief, Remington cites to the bare District Court case of *Mango's Tropical Cafe v. Mango Martini Restaurant*, 844 F. Supp. 2d 1246 (SD Fla. 2011).  However, the *Mango's* case was a Temporary Restraining Order ("TRO") case <u>and not a preliminary injunction case</u>, and thus the holding of which is directly contrary to Remington's representations to the Court:

> After considering the motion and related filings, the testimony of the witnesses and the documents admitted into evidence at the hearing, the oral arguments of counsel, and the entire record in this case, Plaintiff's motion for a TRO will be Denied, for the reasons set forth below. **<u>The denial of this motion does not preclude Plaintiff from pursuing its motion for a preliminary injunction after further factual development.</u>**

*Mango's,* 844 F. Supp. at 1249 (emphasis added).

     Remington further errs in arguing that supposedly the *Mango's* case would support a finding of "extensive third-party use".  Indeed, and as a matter of law, any qualifying third-party use must be **<u>in regard to the same or related goods.</u>** *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 316 (5th Cir.1981) (emphasis added).  Instead, here Remington cites to such irrelevant and divergent uses on:

- automobiles
- aircraft tiedown systems
- kayaks
- aluminum
- polyurethane
- graphene oxide

- optical cables
- luggage
- carbon fiber
- hammocks
- steel
- body armor

(*See,* Exhibit A, Doc. 41, filed 12/4/2014).

     Yet further, Remington's reliance upon the irrelevancy of a TRO denial in the *Mango's* case, is yet further misplaced because: (1) the *Mango's* Court subsequently <u>entered an injunction</u>; and (2) the infringer (a) <u>ceased any further use of the MANGO trademark,</u> (b) <u>destroyed all</u>

13

offending inventory and advertising material, (c) removed the term "Mango" from its corporate name, and (d) cancelled its *Mango* containing domain name. (*See*, Declaration of Jose Flores - Defendants' Representative, *Mango's Tropical Cafe v. Mango Martini Restaurant,* Case No. 11-cv-24619, Exhibit B hereof).

In contrast, in equity and in all reasonableness, Daniel Defense seeks far less here.

### 2.    Remington's Reliance on the *Investacorp* case is Misplaced.

Remington seeks to extrapolate from *obiter dicta* in the outdated and factually distinguishable case of *Investacorp, Inc. v. Arabian Inv. Banking Corp.,* 931 F. 2d 1519 (11th Cir. 1991), in arguing contrary to the USPTO record that:

(i)     the federally registered marks here are supposedly "merely descriptive"; and

(ii)    the (albeit *non sequitur*) supposedly that Daniel Defense's federal registrations would somemehow not be entitled to a presumption of secondary meaning.[9]

(Doc. 41, filed 12/4/2014, p. 21).

However, the fact pattern prevailing in the *Investacorp* case,[10] no longer reflects the standards of the USPTO in examining trademark applications on the subject of "mere descriptiveness".  Specifically, the *Investacorp* panel argues that under USPTO examination standards (that were in existence in 1986), the Court there could not determine whether there had been an examination for "mere descriptiveness".[11]

---

[9] Based, *inter alia,* upon Daniel Defense's extensive period of prior use, substantial coverage in the industry press, and large advertising expenditures, Daniel Defense has no real need herein to rely upon the statutory presumption. But, transparently, Remington does have a need to attempt to negate the presumption, because Remington has submitted no evidence to meet its resulting burden of proving that there is no secondary meaning present.

[10] The *Investacorp* case is yet further factually distinguishable because the *Investacorp* trademark owner had spent no more that $100 per month on advertising (*Investacorp,* 931 F.2d at 1525), in contrast to Daniel Defense's millions of dollars on advertising per year. For example, see attached publically available internet news article showing a revenue of Daniel Defense of $55.7 million dollars in 2013 and compare with the Daniel Defense disclosed rate of 6-8% of its annual revenue rate on marketing. (*See,* Hunter Declaration; Doc 28-5, ¶7, filed 11/10/2014) (*see also,* Exhibit C hereof).

[11] And even though the Lanham Act expressly forbids the granting of registrations on "merely descriptive" marks under § 2(e) without a showing of secondary meaning under § 2(f).

However, the Trademark Manual of Examining Procedure in force <u>in the examination</u> <u>here</u> (7th Edition, October 2010) unambiguously requires compliance by Examiners with the mandates of the Lanham Act, as follows:

- "The examining attorney's first Office action **must** be complete, so the applicant will be advised of …. all grounds for refusal." TMEP § 704.01.
- "The examining attorney **must** consider the evidence of record to determine whether a mark is merely descriptive …." TMEP § 1209.02.
- "A designation that is merely descriptive **must** be refused registration under §2(e)(1) of the Trademark Act, 15 U.S.C. §1052(e)(1)." TMEP § 1209.02.
- "Section 2(f) of the Trademark Act, 15 U.S.C. §1052(f), provides that "proof of substantially exclusive and continuous use" of a designation "as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made" may be accepted as prima facie evidence that the mark has acquired distinctiveness as used with the applicant's goods or services in commerce." TMEP § 1212.05 (emphasis added); *see also* 37 C.F.R. § 2.41(b).

The USPTO's careful and proper examination of Daniel Defense's "LIGHTER. STRONGER. BETTER…" ® trademark application is underscored by the Examiner's examination review sheet (*see*, Exhibit D-1 hereof, P.1), which includes an entry showing that <u>no "Section 2F" evidence of secondary meaning was relevant or required.</u>

In any event, the date of the Examiner's Official Action for the "Lighter. Stronger. Better" ® trademark was August 22, 2011 (*see,* Exhibit D-2 hereof). [12]  On the date of Examination, Daniel Defense had already used its "LIGHTER. STRONGER. BETTER…" ® mark in commerce for more than <u>5 years</u> which demonstrates secondary meaning under Lanham Act (*i.e.*, Daniel Defense's use since as early as February 9, 2006).  As stated above, <u>no</u> <u>"Section 2(f)" evidence of secondary meaning was relevant or required by the USPTO.</u>

---

[12] The Examiner's Official Action for the "Lighter. Stronger. Better…" had a minor and common issue with the applicant's provided specimen.  This issue was resolved via applicant's updated specimen on September 02, 2011.

Accordingly, the factually-specific concerns expressed by the *Investacorp* panel are not present here and as such the *Investacorp* is not applicable.[13]

**III.**   **Daniel Defense Demonstrates a Substantial Likelihood of Prevailing on the Merits; Refocusing the *Lone Star* Factors.**

**A.**   **Daniel Defense's Strong Marks Merit Protection by the Court.**

Registration of a mark under the Lanham Act entitles the owner to a presumption that the mark is valid and thus enables the owner to sue an infringer. *See,* 15 U.S.C. § 1115(a).  More specifically, under the Lanham Act, a certificate of registration acts as *prima facie* evidence of the mark's validity and of the registrant's exclusive right to use the mark. 15 U.S.C. § 1057(b); and 15 U.S.C. § 1115(a).  Registration of the mark, therefore, provides the plaintiff with a presumption that the mark is not merely descriptive, or, if it is merely descriptive, that it has accorded secondary meaning.

> [T]he Director may accept as prima facie evidence that the mark has become distinctive, as used on or in connection with the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made."

*See,* 15 U.S.C. 1052(f).

The clear pronouncements of the statute aside (*i.e.,* in granting secondary meaning after five years of use), the Eleventh Circuit has set forth a number of factors for consideration by a Court (if a determination of secondary meaning were to be required): (1) the length and manner of its use, (2) the nature and extent of advertising and promotion, (3) the efforts made by the plaintiff to promote a conscious connection in the public's mind between the trademark and the plaintiff's business, and (4) the extent to which the public actually identifies the trademark with

---

[13] Furthermore, and of course, Remington does not contend that Daniel Defense's Chevron mark is "merely descriptive".

16

the plaintiff's goods and services.[14] *Gift of Learning Foundation, Inc. v. TGC, Inc.,* 329 F.3d 792, 800 (11th Cir.2003).

Tellingly, Remington, who is thus charged with the burden of proof on this issue, has presented no proof of any kind.  But, even if Remington had presented any such required evidence, it could not overcome Daniel Defense's showing of:

- more than 8 years of prominent use on the Internet;
- searchability in all search engines including Google®;
- consistent trademark marking;
- substantial sales of product under the mark;
- large advertising expenditures;
- extensive blogging;
- frequent news coverage;
- open and notorious uses at numerous trade shows (where Remington/DPMS was present); and
- among many other factors

**B.      The Marks are Confusingly Similar.**

In addition to copying the first two elements of Daniel Defense's "Lighter. Better. Stronger…" ® trademark, Remington also identically copies Daniel Defense's Chevron trademark <u>on the very same infringement.</u>

Remington argues that color and orientation are distinguishing elements. (Doc. 41, filed 12/4/2014, p. 27).  However, Remington cites no legal authority for this non-standard proposition.  In fact, Daniel Defense's "Lighter. Better. Stronger…"® trademark registration plainly states: "THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT ANY CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, **<u>OR COLOR</u>**." (emphasis added) (*see*, '660 Trademark Registration; Doc. 1-1, filed 6/24/2014).

---

14 Additionally, in the Eleventh Circuit, "proof of intentional copying is probative evidence on the secondary meaning issue." *Brooks Shoe Mfg., Inc. v. Suave Shoe Corp.*, 716 F.2d 854, 860 (11th Cir. 1983).

Nor is Remington permitted to "reinterpret" Daniel Defense's Chevron trademark as a distinctly different mark "DD". (Doc. 41, filed 12/4/2014, pp. 27-28).  Although such chevrons might be deemed as "visual puns" of sorts, but <u>chevrons remain chevrons.</u>

Moreover, and to correct Remington, although color is not a required feature of Daniel Defense's registered Chevron mark, Remington, the infringer, does use a similar color when it comes to Daniel Defense's Chevrons trademark. *See,* DDM4 Rifle Manual, Exhibit E hereof. (*"*publically available" at:

http://media.danieldefense.com/download.php?d=files/HotLink/&f=DDM4-Manual.pdf).

Therefore, Remington's Chevron infringements are identical for all practical purposes to Daniel Defense registered Chevron trademark.

## C.     The Goods are Both "Related Goods" and "Identical Goods".

Remington again struggles to create arguments, and here argues incorrectly that supposedly Daniel Defense does not use its trademark on firearms *per se*, but only on firearms components and/or accessories. (Doc. 41, filed 12/4/2014, pp. 28-30). Remington is wrong. Daniel Defense's DDM4 Rifle Manual clearly shows use of the LIGHTER. BETTER. STRONGER…" ® trademark repeatedly throughout **the Rifle Manual** in direct connection with firearms (i.e., the DDM4 rifle), *per se*. *See*, Exhibit E.  And, the cover of the DDM4 Rifle Manual shows Daniel Defense's Chevron trademark (depicted in a large yellow format) used in direct conjunction with firearms (i.e, the DDM4 rifle).

But in any event, firearms and firearms components and accessories inherently fall within the "related goods doctrine" and the "natural expansion doctrine" under the trademark law.  The 11th Circuit law in this respect is clear:

> [T]he scope of protection enjoyed by a trademark owner is not restricted to the
> owner's original use. The "natural expansion" doctrine is applied to determine the

18

proper scope of protection where a mark owner's previous use differs from its current use, and the junior use intervenes. Under this doctrine, the first trademark owner's rights are limited to goods on which the mark has already been used or that lie within the realm of natural expansion; "[t]his appears to be no more than a specific application of the familiar 'related goods' test." *J. McCarthy*, § 24:20.[23] *See also Carnival, 187 F.3d at 1310-11*…

The court in *Tally-Ho* explained that a senior user's rights "may extend into uses in 'related' product or service markets (termed the `related goods doctrine')," and that "an owner of a common law trademark may use its mark on related products or services and may enjoin a junior user's use of the mark on such related uses…." 889 F.2d at 1023 (*citing J. McCarthy*, § 24:1 to 24:12)…

Courts determine the proper scope of protection of a mark in the context of intervening uses by applying the "source or sponsorship" test. Under this test, a trademark owner has "protection against use of its mark on any product or service **which would reasonably be thought by the buying public to come from the same source,** or thought to be affiliated with, connected with, or sponsored by, the trademark owner." J. McCarthy, § 24:6. The public perception in this regard is determined at the time the junior user first used the mark on the product or service to which the allegedly infringing mark is affixed.[24] Carnival, 187 F.3d at 1312. The court in Tally-Ho explained that "related use" is "merely a facet of the likelihood of confusion test and therefore requires an inquiry into [the] seven factors affecting the likelihood of confusion…."[25] 889 F.2d at 1027.

*Planetary Motion v. Techplosion*, 261 F. 3d 1188, 1201-02 (11th Cir. 2001) (emphasis added); s*ee also, E. Remy Martin & Co. v. Shaw-Ross International Imports, Inc.,* 756 F.2d 1525, 1530 (11th Cir.1985) [wine and cognac or brandy; goods which the Eleventh Circuit held to be "related in the mind of consumers"]; *see also, Frehling* 192 F.3d at 1337 [involving competing manufacturers of home furnishings].

Under the present facts, the Public does indeed expect firearms components/accessories and fully assembled firearms to come from the same source(s) -- as that is the overwhelming practice in the industry.  In fact, Remington itself advertises at least the following firearms components and/or accessories on its website:[15]

- 308 GII Parts
- In Stock Uppers and Parts
- On Sale Items
- DPMS Gear
- Barrels
- Upper Barrel Assemblies

- Magazines
- Brass Catchers and Deflectors
- Optics
- Replacement Parts
- Rifle Kits
- Slings

---

[15] http://www.dpmsinc.com/Store_c_19.html

- Upper Barrel Kits
- Bipods
- DPMS Gun Care
- Flash Lights

- Tools
- Iron Sights
- Lower Receivers
- Rails

**D.      The Marketing Channels are Identical.**

In addition to marketing their goods at their respective Internet retail stores: (1)

- https://danieldefense.com
- http://www.dpmsinc.com

both parties advertise on the Internet.

Moreover, a large number of independent Internet dealers sell <u>both</u> Daniel Defense and

DPMS products together on the same website/store:

- http://www.midwayusa.com/brand#D[16]
- https://www.primaryarms.com/category_s/4286.htm
- http://grabagun.com/firearms/ar-15-ar10-and-other-ar/ar-uppers.html[17]
- http://www.brownells.com/
- among many, many others.

And virtually all gun publications cover both Daniel Defense and DPMS products.  For

example, the prominent <u>Guns & Ammo</u> trade publication regularly covers the products of <u>both</u>

Daniel Defense and DPMS (including two of the very products at issue here: (i) Daniel Defense

DDM4 rifle, and (ii) the DPMS GII 308 rifle).[18]

**E.      The Advertising Media are Identical.**

In addition to the advertising function of Internet stores, both Daniel Defense and DPMS

are regular attendees of the annual trade show, "the SHOT Show".[19] The Shot Show is the largest

---

[16] In fact, many sellers advertise Daniel Defense goods as being compatible with DPMS rifles (e.g. "Daniel Defense 7.62 Lite Rail Free Float Tube Handguard Quad Rail DPMS LR-308 Aluminum Black").

[17] Grabagun advertises: "Daniel Defense AR10 LITE RAIL 12-inch for DPMS: http://grabagun.com/daniel-defense-ar10-lite-rail-12-inch-for-dpms.html.

[18] *Compare,* http://www.gunsandammo.com/rifles/ar-15/daniel-defense-ddm4-isr-300/; *and* http://www.gunsandammo.com/network-topics/the-guns-network/first-look-dpms-gii-308/

[19] http://shotshow.org/exhibitors/; as well as numerous other firearm tradeshows.

trade show of its kind in the world and the fifth largest trade show in Las Vegas, the SHOT Show

brings together:

- more than 62,000 attendees;
- more than 1,600 exhibiting companies;
- 630,000 net square feet of exhibit space; and
- 50 states and 100 countries.

*Available at:* http://shotshow.org/shot-show-2015-exhibitor-list/

Also, both Daniel Defense and DPMS appear regularly on consumer and critic blogs.
*Available at* http://www.thefirearmblog.com.

**F.      Bad Faith Intent is a Permissible Inference to be Drawn from Remington's Copying.**

Unquestionably, Remington knew of Daniel Defense's registered trademarks when

Remington began its use of the accused marks.  Here, the inference of bad faith is created

because Remington was intentionally blind to confusion between the parties' marks. *Frehling*,

192 F.3d at 1340.

Indeed, the inference of bad faith can be based on knowledge alone. *Daddy's Junky Music*

*Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 286 (6th Cir. 1997). ([T]he use

of a contested mark with knowledge of the protected mark at issue can support a finding of

intentional copying.)

Thus, the conclusions that Remington: (i) knew of Daniel Defense trademarks; and (ii)

then chose to copy them anyway -- are inescapable.

**G.      Proof of Actual Confusion is Not Necessary, and is Difficult to Detect.**

Remington makes much of the notorious difficulty of detecting actual confusion.

However, actual confusion is not a necessary element for proving likelihood of confusion. *See*,

21

*Bauer Lamp Co., Inc. v. Shaffer*, 941 F. 2d 1165, 1172 (11th Cir. 1991); s*ee also, Borinquen*

*Biscuit Corp. v. MV Trading Corp.,* 443 F. 3d 112, 120 (1st Cir. 2006).

Yet further, and taking into account that Remington's relative short period of

infringement (before the lawsuit was filed), any instances of actual confusion would be even

more difficult to detect. *Borinquen Biscuit Corp. v. MV Trading Corp.,* 443 F. 3d 112, 121 1st

Circuit 2006.

> [H]istorically, we have attached substantial weight to a trademark holder's failure
> to prove actual confusion only in instances in which the relevant products have
> coexisted on the market <u>for a long period of time</u>."

*Borinquen Biscuit Corp. v. MV Trading Corp.,* 443 F. 3d 112, 121 (1st Cir. 2006)

So it is here.

## IV.    Irreparable Harm Is Present Here.

### A.    There is No Adequate Remedy at Law, and Thus a Preliminary Injunction is Necessary to Prevent Irreparable Harm.

Remington cites to the case of *eBay, Inc. v. MercExchange, LLC.*, 547 U.S. 388 (2006) (a

patent case) for the proposition that when infringement is found, a permanent injunction is not

**<u>automatic</u>**.  Of course, there is a multiplicity of fact patterns where patented technology should

not be withheld from the Public in instances where: (i) the patent holder is unable to supply the

market demand; and (ii) where the technology relates to such subjects as: (a) life-saving

technology (*e.g.,* pharmaceuticals, surgical equipment, etc.), (b) municipal water systems and

other pollution control devices, (c) energy saving devices, etc.  Those instances that may apply in

patent situations are not applicable here in this trademark case.

Moreover, Remington argues that there is no direct evidence of irreparable harm. (Doc.

41, filed 12/4/2014, pp. 35-36).  Again, Remington is wrong.  Nor has Remington thought-out

the ramifications of its argument, as Remington in essence is proposing a long-term "mandatory

license" for Daniel Defense's trademarks.  Under the trademark law, such a scheme would be entirely unworkable.

First, a patent is of limited duration (i.e., twenty (20) years from the original filing date), but trademarks may continue for centuries.  Setting aside, the calculation of such a royalty rate, (and the ability of a competitor to pay and still remain competitive), the extensive accounting work to be done over an extended period of time would be grossly inefficient, and would more than likely encourage future conflicts.

Second, the very purpose of trademark law is to protect the Public from being deceived as to the source of origin, sponsorship or approval.  Accordingly, Remington's argument that money damages would somehow ameliorate **the injury to the Public** is misplaced (as the Public would not be receiving any payment of money damages).

Thirdly, and most fundamentally, if such infringement were to continue, the entire value of the trademark owner's trademarks as indicia of sources of origin would be lost.  Indeed, the entire function of a trademark would be defeated.

Fourthly, in calculating an *in futuro* royalty rate if no injunction were to issue, the ability to prove diversion of sales is inherently difficult in the real world marketplace because, *inter alia*, this is not a two-party market, but rather a market place of multiple firearms and firearms accessories sellers.

Fifthly, on the alternative method of calculating a royalty rate going forward, if no injunction were to issue, the ability to prove infringer's profits would be a very complex task.  Such a complex task would not be necessary if the unlawful acts of infringement were to be curtailed via an injunction.

Sixthly, and although the *eBay* case does require a case-by-case analysis, there is no presumption <u>against</u> the granting of injunctions (permanent or preliminary), as Remington seems to imply.

Finally, in conservation of the parties' and judicial resources, the respectful question must be asked as to the level of benefit (if any) to the Public or to the parties <u>in permitting a</u> <u>continuing infringement</u>, which would require: (a) <u>continued involvement</u> of the Court; and (b) continued supervision of the Remington's *de facto* licensed products' <u>quality</u>.  Neither parties nor the Courts should be stuck in such supervisory roles, *ad infinitum*.

Therefore, Remington's *eBay* argument must be rejected.

**B.      There Was No Material or Unreasonable Delay By Reason of Remington's Request for Settlement Talks.**

In an attempt to argue that there is somehow no irreparable harm, Remington also seeks to inject the subject of "delay" into this case. (Doc. 41, filed 12/4/2014, p. 36).  However, the salient point is that it is essential is that Daniel Defense receive suitable injunctive relief prior to the major industry trade show, the "2015 SHOT Show", that is upcoming in Las Vegas on January 20, 2015 (through January 23, 2015).

After the filing of the present lawsuit on June 24, 2014, the parties held extensive settlement negations regarding the scope of necessary changes to Remington's accused advertising (as further evidenced in the Joint Status Report). (Doc. 46, filed 12/15/2014, p. 8). Manifestly, Remington provoked the delay that it now seeks to use to its benefit.[20] Unfortunately, those talks were not successful.  However, Remington should not be permitted to

---

[20] As a matter of courtesy to Remington, Daniel Defense does not disclose the details of these settlement negotiations at this time (even though this evidence is clearly admissible for **"negating a contention of undue delay"**, such as Remington unaccountably argues here). *See,* F.R.Evid. Rule 408(b).

"boot-strap" itself into an argument that Daniel Defense's respect for the Court and the judicial resources should be used against Daniel Defense.

Moreover, Daniel Defense had placed Remington <u>on notice</u> (via its Complaint and later the Amended Complaint), as early as June 24, 2014, that a preliminary injunction would be necessary in this case:

> Prayer for relief:
>
> 2. Defendants (and all affiliated or related entities, agents, officers, employees, representatives, successors, assigns, attorneys, and all other persons acting for, with, by, through, or under authority from Defendants, or in concert or participation with Defendants), **be preliminarily and permanently enjoined** from any use of the Daniel Defense Trademarks (and any confusingly similar variations thereof) in connection with using, manufacturing, advertising, promoting, selling or offering for sale, firearms and firearms accessories, in any tangible and intangible form(s) (including advertisements, online and print product catalogues, tradeshow materials, advertising banners, sales or website materials, social media sites and online in any form whatsoever); (emphasis added).

(Doc. 1, filed 6/24/2014, pp. 17-18) (Doc. 14, filed 09/02/2014, pp. 17-18).

Accordingly, Remington was on notice, but nonetheless itself had provoked the facts that it now argues constitute an unexcused "delay". Yet further, and tellingly, Remington has not attempted to show any prejudice resulting from its self-generated "delay".

<strong>CONCLUSION</strong>

Daniel Defense has fully satisfied the requirements for preliminary relief, and thus respectfully requests that this Court grant its motion to preliminarily enjoin Remington (pending the final outcome of this action).

Respectfully submitted this the 17th day of December, 2014.

<u>/s/ Justin Charles Ward</u>

| | |
|---|---|
| Justin Charles Ward | Robert M. Ward |
| Georgia State Bar No. 746408 | Georgia State Bar No. 775401 |
| jward@danieldefense.com | rward@dilworthip.com |
| DANIEL DEFENSE, INC. | DILWORTH IP, LLC |

25

| | |
|---|---|
| 101 Warfighter Way | 3455 Peachtree Road NE |
| Black Creek, GA 31308 | 5th Floor |
| Tel:  (912) 851-3293 | Atlanta, GA 30326 |
| | Tel: (404) 606-6480 |

William G. Glass                           A. Robert Casella
Georgia Bar No. 297340          Georgia Bar No. 115611
bglass@wswgs.com                    rcasella@wswgs.com
WEINER, SHEAROUSE, WEITZ,
GREENBERG & SHAWE, LLP
Post Office Box 10105
Savannah, GA 31412
Tel: (912) 233-2251
*Attorneys for Plaintiff Daniel Defense, Inc.*

## CERTIFICATE OF SERVICE

I do hereby certify that this 17th day of December, 2014, I served a copy of the foregoing **DANIEL DEFENSE'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION** in accordance with the notice of electronic filing requirements on:

| | |
|---|---|
| Jason C. Pedigo | Nathan C. Belzer |
| J. Patrick Connell | Belzer PC |
| Ellis, Painter, Ratterree & Adams, LLP | 2905 Bull Street |
| 2 East Bryan St., 10th Floor | Savannah, GA 31405 |
| Savannah, GA 31401 | |

**/s/ Justin Charles Ward**

| | |
|---|---|
| Justin Charles Ward | Robert M. Ward |
| Georgia State Bar No. 746408 | Georgia State Bar No. 775401 |
| jward@danieldefense.com | rward@dilworthip.com |
| DANIEL DEFENSE, INC. | DILWORTH IP, LLC |
| 101 Warfighter Way | 3455 Peachtree Road NE 5th Floor |
| Black Creek, GA 31308 | Atlanta, GA 30326 |
| Tel:  (912) 851-3293 | Tel: (404) 606-6480 |

William G. Glass                           A. Robert Casella
Georgia Bar No. 297340          Georgia Bar No. 115611
bglass@wswgs.com                    rcasella@wswgs.com
WEINER, SHEAROUSE, WEITZ,
GREENBERG & SHAWE, LLP
Post Office Box 10105
Savannah, GA 31412
Tel: (912) 233-2251
*Attorneys for Plaintiff Daniel Defense, Inc.*

26